BALLAY, Stephen J., Bandosz, Albert J., Beebee, Susan, Beebee, Peter C., Behmer, L. Nelson, Behmer, Robert L., Bell, Elizabeth W., Broccolini, Agnes M., Burke, Jr., John J., Zappitelli, Sophie Chelyk and John A., Deal, Richard A., Deal, Jr., William W., Dudugjian, Carl, as Trustee, Espinoza (Schimmel), Bobbi S., Flamm, George S., Flansburg, Frank M., Gallagher, David G. and Jacqueline, Goldman, Arthur S., Gould, Herbert E., Hoover, Robert A., Jacobs, Richard W., Merriken, Charles J. and Phylliss A., Munger, Edith L., Persons, Jr., Oren M., Resnick, Albert, Richter,

Ronald and Lynn, Robinson, Edmund H., Smedley, L., as Trustee, Smith, Allen and Christine, Uhrman, Gary H., Weyforth, Philip A., Williamson, Dennis, Zappitelli, Michael J. and Anna O., Zook, Dunwoody, for Zook, Melissa D., and Zook, II, William H.D., and Zook, Suzanne C., Goldfine, Sanford D., Staniskis, Peter

v.

**LEGG MASON WOOD WALKER, INC., Appellant in 90–1412.**

BALLAY, Stephen J., Bandosz, Albert J., Beebee, Susan, Beebee, Peter C., Behmer, L. Nelson, Behmer, Robert L., Bell, Elizabeth W., Broccolini, Agnes M., Burke, Jr., John J., Zappitelli, Sophie Chelyk and John A., Deal, Richard A., Deal, Jr., William W., Dudugjian, Carl, as Trustee, Espinoza (Schimmel), Bobbi S., Flamm, George S., Flansburg, Frank M., Gallaher, David G. and Jacqueline, Goldman, Arthur S., Gould, Herbert E., Hoover, Robert A., Jacobs, Richard W., Merriken, Charles J. and Phylliss A., Munger, Edith L., Persons, Jr., Oren M., Resnick, Albert, Richter, Ronald and Lynn, Robinson, Edmund H., Smedley, L., as Trustee, Smith, Allen and Christine, Uhrman, Gary H., Weyforth, Philip A., Williamson, Dennis, Zappitelli, Michael J. and Anna O., Zook Dunwoody, for Zook, Melissa D., and Zook, II, William H.D., and Zook, Suzanne C., Goldfine, Sanford D., Staniskis, Peter

v.

**LEGG MASON WOOD WALKER, INC.**

Appeal of Stephen J. BALLAY, Albert J. Bandosz, Susan Beebee, Peter C. Beebee, Nelson L. Behmer, Robert L. Behmer, Elizabeth W. Bell, Agnes M. Broccolini, John J. Burke, Jr., Sophie Chelyk and John A. Zappitelli, Richard A. Deal, William W. Deal, Jr., Carl Dudugjian, as Trustee, Bobbi S. Espinoza (Schimmel), George G. Flamm, Frank M. Flansburg, David G. and Jacqueline Gallagher, Sanford D. Goldfine, Arthur S. Goldman, Herbert E. Gould, Robert A. Hoover, Richard W. Jacobs, Charles

J. and Phylliss A. Merriken, Edith L. Munger, Oren M. Persons, Jr., Albert Resnick, Ronald and Lynn Richter, Edmund H. Robinson, L. Smedley, as Trustee, Allen and Christine Smith, Peter Staniskis, Gary H. Uhrman, Philip A. Weyforth, Dennis Williamson, Michael J. and Anna O. Zappitelli, Dunwoody Zook, for Melissa D. Zook and William H.D. Zook, II, and Suzanne C. Zook, Appellants in 90–1427.

Nos. 90–1412, 90–1427.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1990.

Decided Feb. 15, 1991.

Rehearing and Rehearing In Banc Denied March 21, 1991.

William A. DeStefano, Christopher Warren (argued), Conrad, O'Brien, Gellman, DeStefano & Rohn, Stephen M. Feldman, Philadelphia, Pa., for appellees.

C. Clark Hodgson, Jr. (argued), David C. Franceski, Jr., Keith R. Dutill, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for appellant.

William J. Fitzpatrick, Securities Industry Ass'n, New York City, for amicus-appellant.

Before SLOVITER, Chief Judge,* MANSMANN, Circuit Judge, and SAROKIN, District Judge.**

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this lawsuit brought by the named investors against their brokerage firm, Legg Mason Wood Walker, Inc. ("Legg Mason"), for alleged oral misrepresentations made concerning the book value calculation of securities, two issues require resolution in this appeal following a jury trial. The first presents an issue not yet ruled upon by any federal appellate court: whether section 12(2) of the Securities Act of 1933 affords a remedy to a buyer of securities in the secondary market.[1] This question is purely one of statutory construction which implicates our plenary standard of review. *Chrysler Credit Corp. v. First Nat'l Bank and Trust Co.,* 746 F.2d 200, 202 (3d Cir.1984); *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981). We believe that the language and the legislative history of section 12(2) demonstrate that Congress did not there intend to protect buyers in the aftermarket, and we hold that section 12(2) provides a remedy to buyers of securities only in the initial distributions. The district court thus erred as a matter of law in sending this count of the complaint to the jury. We will reverse the judgment of the district court on this count and remand for the entry of judgment in favor of Legg Mason.

Our resolving this initial issue in favor of Legg Mason requires that we determine whether the investors are entitled to a new trial on their count under section 10(b) of the 1934 Securities Exchange Act. We must address whether the district court erred in refusing to charge the jury that

---

* Judge Sloviter became Chief Judge on February 1, 1991.

** Honorable H. Lee Sarokin of the United States District Court for the District of New Jersey, sitting by designation.

1. *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 203 (3d Cir.1990) (noting no appellate decision on this issue as of May 9th). This issue has been litigated in the federal district courts more frequently since 1976 when the Supreme Court ruled in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that proof of scienter is a requirement for a section 10(b) claim under the 1934 Securities Exchange Act. The standard under section 12(2) is, however, a lesser, negligence, standard. *See* Hazen, A Look Beyond the Pruning of Rule 10b–5: Implied Remedies and Section 17(a) of the Securities Act of 1933, 64 Va.L.Rev. 641, 644 n. 15 (1978) (predicting increased usage of section 12(2) following *Hochfelder* ). In addition, the measure of damages available under section 12(2) is greater than under section 10(b). *Hoxworth,* 903 F.2d at 203, 203 n. 25.

the investors' reliance upon their broker John Burke, as their agent, could establish their section 10(b) claim. We find that, at most, this omission constituted harmless error. For this reason we will affirm the judgment of the district court on this second count.

## I.

It is well settled that, on appeal, the verdict winner is entitled to have all the facts and inferences therefrom, as reflected by the jury's verdict, construed in its favor. We state the facts here in light of that standard.

The investors include 41 Legg Mason clients, their stockbroker John Burke, an investor himself, and an additional Legg Mason client, Sanford Goldfine, a client of a different Legg Mason broker. The investors purchased securities of Wickes Company, Inc. through Legg Mason during the period from June 1986 through August 1987. The parties have stipulated that Legg Mason earned commissions for those sales.

According to Burke, who served as Legg Mason's Bryn Mawr, Pennsylvania branch manager, Legg Mason is a full service brokerage house [2] which subscribes to a value philosophy of investing. Employing this value philosophy, Legg Mason promotes investment in the undervalued stock of companies that show potential for future growth. Legg Mason's Anthony Pearce–Batten, a securities analyst in Legg Mason's Baltimore, Maryland research department, articulated this philosophy as "look[ing] for out of favor situations which possess characteristics in one form or another that gives one the basis for believing that there is limited risk involved with investing in those stocks." Typically, "out of favor situations" would involve purchasing

securities from companies that have recently emerged from bankruptcy or reorganization, as had Wickes. Investing in these companies is attractive because, according to Legg Mason's theory, these companies present little "downside" risk.

At trial Legg Mason produced evidence that numerous factors weighed in the calculation of value, of which goodwill was only one. The investors, however, argued that because the value investment philosophy is predicated on the approximate equivalence between the purchase price of aggregate shares and liquidation value, intangible assets, such as goodwill,[3] which are not readily sold in a liquidation, should not be included in a company's tangible assets for purposes of estimating the downside risk.

Wickes emerged from bankruptcy in January 1985 and its president subsequently engaged in restructuring maneuvers to strengthen the company's financial health. In addition, Wickes acquired holdings in wallcoverings and furnishings and sold others in apparel and hosiery. According to Legg Mason research reports, this restructuring boded well for Wickes' future. Nevertheless, some of the reports suggested that only those investors more willing to tolerate risk invest in Wickes securities.

Batten recommended investment in Wickes from June of 1986 through November of 1987. These recommendations, according to John Burke, were made orally by means of an interoffice "squawk box" to the Bryn Mawr branch office and also in various written communications circulated to Legg Mason's brokers and clients. Burke testified that in 1986 he heard Batten report over the "squawk box" that Wickes had a book value [4] of $5.00 per share excluding goodwill.

---

**2.** According to the testimony, full service brokerage firms provide clients with investment counseling services in contrast to discount firms which merely follow client orders to purchase and sell stock.

**3.** According to the investors' expert testimony, goodwill "represents the amount of money that is paid in the purchase of another firm in excess

of what the market value of all the assets of that firm are worth."

**4.** Book value, according to the investors' excerpt from Barron's Dictionary of Finance and Investment Terms, admitted into evidence, is defined as:

net asset value of a company's securities calculated by using the following formula:

An August 10, 1987, Legg Mason research report concerning Wickes suggested that "positives outweigh the negatives—buy," and listed Wickes' book value per share at $23.70.[5] The report also stated: "It is worth observing that current assets comprise almost two thirds of Wickes' $3.5 billion asset base *net of goodwill* . . ." (emphasis added). Another Legg Mason report, dated August 25, 1987, included a computation of Wickes' book value per share of stock at $25.00 with the notation "(excludes goodwill)." A third and undated Legg Mason document also recommended the purchase of Wickes securities and included the statement that ". . . with the stock presently selling at less than 40 percent of stated book value (*excluding goodwill*), any share repurchases would generate substantial equity growth" (emphasis added). A Legg Mason vice president, David Nelson, admitted that all of these references to goodwill were erroneous.

In its defense, Legg Mason contended that these references were "merely typographical errors" made "after the vast majority of the investors had already purchased their shares of Wickes." Further, Legg Mason corrected these misstatements in both the November 27, 1987, and the December 17, 1987, reports which clarified that much of the stated book value consisted of goodwill. Moreover, David Nelson, who supervised the research department during this period, testified that these written misrepresentations had not even been discovered until after the investors initiated their lawsuit.

In their Amended Complaint, the investors pled causes of action under section 12(2) of the 1933 Securities Act, 15 U.S.C. § 77*l*(2), and section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j. Because sixteen of the investors had signed customer contracts containing arbitration provisions, Legg Mason moved for a stay of all proceedings and to compel arbitration of these investors' claims. The district court ordered the common law and the 1934 Securities Exchange Act claims to arbitration, but denied the motion to compel arbitration of the 1933 Securities Act claims. Legg Mason appealed and we affirmed the district court. *Ballay v. Legg Mason Wood Walker, Inc.*, 878 F.2d 729 (3d Cir. 1989).

While the appeal was pending, the district court conducted a week long trial on the liability portion of those counts not ordered to arbitration, including the 1933 Act claims of the sixteen plaintiffs who had signed the customer agreements, and all the claims of the remaining plaintiffs.[6]

In their pretrial memorandum and proposed jury instructions on the section 10(b) claim, the investors raised a theory of agency liability and requested that the district court give a charge that read, in part, that ". . . as a matter of law John Burke was acting as the agent for all investors at the time they purchased securities in Wickes". The district court refused to give this instruction.

The jury found for Legg Mason on the section 10(b) claim and for the investors on their section 12(2) claim, and in answer to a special interrogatory, the jury specified a violation date of June, 1986.

Legg Mason moved, *inter alia*, for judgment N.O.V. and for a new trial, asserting that section 12(2) should not be applied to secondary markets. The district court denied the motions, applying section 12(2) to aftermarket trading, reasoning that the plain language of section 12(2) did not limit

---

Total assets *minus* intangible assets (goodwill, patents, etc.) *minus* current liabilities *minus* any long-term liabilities and equity issues that have a prior claim (subtracting them here has the effect of treating them as paid) *equals* total net assets available for payment of the issue under consideration.

The total net asset figure divided by the number of . . . shares of . . . stock, gives the *net asset value*—or book value—per . . . share of . . . stock.

Book value can be a guide in selecting underpriced stocks and is an indication of the ultimate value of securities in liquidation.

5. The book values, which vary from $5.00 to $23.70, reflect a five to one reverse stock split.

6. The investors withdrew additional counts of common law "aiding and abetting" and controlling person liability under 15 U.S.C. §§ 77*o*, 78t.

its application to initial distributions of securities and that the broad remedial purposes of the Securities Act of 1933 were not rigidly restricted to initial distributions. The district court found particularly persuasive the Supreme Court's application of section 17 of the 1933 Act, section 12(2)'s criminal analogue, to secondary markets. *See United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). Therefore, the district court confirmed its earlier conclusion, reached in denying Legg Mason's motion to dismiss, that section 12(2) applied to secondary market trading. The court then certified for interlocutory appeal the issue of "whether [section 12(2) ] can be applied to fraud occurring in the secondary markets." We denied Legg Mason's petition for interlocutory appeal. After the parties stipulated as to damages, the district court entered its judgment against Legg Mason for $1,129,496.55.

Legg Mason here appeals the district court's conclusion that section 12(2) applies to secondary market trading.[7] The investors cross-appeal the district court's refusal to charge the jury on their agency theory of section 10(b) liability; they ask for a new trial on that count in the event that we determine that section 12(2) does not apply to the aftermarket.[8] We hold that because the jury found against John Burke on his section 10(b) claim, the investors cannot prevail on their agency theory. Therefore, the district court's refusal to charge the jury on this theory constituted, at most, harmless error.

## II.

■ The resolution of our first issue, whether section 12(2) of the 1933 Act creates a cause of action for an oral misrepresentation in the secondary market, requires that we begin with the precise language of section 12(2). *See Ernst & Ernst v. Hoch-*

*felder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) (the starting point in every case involving statutory construction is the statutory language). Section 12 reads:

Any person who—

(1) offers or sells a security in violation of § 77(e) of this title, or

(2) offers or sells a security (whether or not exempted by the provisions of § 77(c) of this title other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, *by means of a prospectus or oral communication*, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

15 U.S.C. § 77*l* (emphasis added).

As its language suggests, section 12(2) provides a remedy and rescissionary damages, only to a purchaser of securities against an offeror or seller of securities in the event that

1. Defendants offered or sold a security;

---

7. With the exception of the materiality of its misrepresentations concerning the exclusion of goodwill from book value, Legg Mason does not challenge any of the factual elements of a section 12(2) cause of action. Because we hold that section 12(2) does not provide a cause of action to buyers in secondary trading, we do not reach the issue of materiality.

8. Although all the investors are listed in the Notice of Appeal, presumably those investors raising the agency theory of liability are only those clients of John Burke. Obviously neither John Burke nor Sanford Goldfine, who used another broker at Legg Mason, can advance this agency theory.

2. By the use of any means of communication in interstate commerce;

3. Through a prospectus or oral communication;

4. By making a false or misleading statement of a material fact or by omitting to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading;

5. Plaintiff did not know of the untruth or omission; and

6. Defendants knew, or in the exercise of reasonable care, could have known of the untruth or omission.

*Monetary Management Group, Inc. v. Kidder, Peabody & Co., Inc.*, 615 F.Supp. 1217, 1222 (D.C.Mo.1985).

Crucial to our resolution of whether section 12(2) applies to the secondary market is the meaning of the words "oral communication" in the phrase "prospectus or oral communication." Because the 1933 Act does not define "oral communication," we must interpret the plain meaning of these words in light of their context in the statute and in keeping with the intent of Congress in passing the 1933 Act. *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) ("if the statute is clear and unambiguous, that is the end of the matter, for the court ... must give effect to the unambiguously expressed intent of Congress.").

We agree with both parties that the words "prospectus or oral communication" must be construed as related terms. We are persuaded that the plain meaning of the words "prospectus or oral communication" together is that buyers may recover for material misrepresentations made in a prospectus or in an oral communication related to a prospectus or initial offering. *See Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985) ("words grouped in a list should be given related meaning") (citation omitted). This reading comports with the canon of construction *noscitur a sociis*, which instructs that a provision should not be viewed "in isolation but in light of the words that accompany it and give [it] meaning." *Massachusetts v. Morash*, 490 U.S. 107, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989). As the Supreme Court noted when construing the meaning of·one term in a phrase:

> [t]he maxim *noscitur a sociis*, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.

*Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961).

The fact that "oral communication" keeps company with "prospectus" suggests, as both parties have admitted, that the more general term be limited to conform to the more restrictive term where consonant with the legislative intent. We deduce no evidence that Congress intended an expansive meaning of oral communication unconnected to the term "prospectus." Congress defined the term "prospectus" as any "prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security," in section 2(10), 15 U.S.C. § 77b(10).

We believe that Congress employed the term "prospectus" as a term of art which describes the transmittal of information concerning the sale of a security in an initial distribution. In addition to its definition, the use of the term "prospectus" in various sections of the 1933 Act supports a reading restricted to initial distributions. Section 10 of the 1933 Act, 15 U.S.C. § 77j, which mandates the information required in a prospectus, clearly ties a prospectus with registration statements filed with the Securities Exchange Commission. For example, a prospectus shall contain the information required in a registration statement, but may omit some documents required of registration statements. 15 U.S.C. § 77j(a)(1). Section 10(a)(3) provides for current information in a prospectus used over nine months from the effective

date of the registration statement. 15 U.S.C. § 77j(a)(3). Even an abbreviated prospectus authorized by section 10(b), 15 U.S.C. § 77j(b), which is not subject to the registration statement requirements of section 11, 15 U.S.C. § 77k, must be filed with the registration statement. Further, under section 5(b)(1), 15 U.S.C. § 77e(b)(1), a prospectus not meeting the requirements of section 10 may not be used in interstate commerce to sell registered securities. In addition, in its award of special powers to the Securities Exchange Commission, Congress gave the Commission power to amend requirements for "registration requirements and prospectuses." 15 U.S.C. § 77s. Thus Congress repeatedly used the term "prospectus" in provisions concerning registration statement requirements in initial distributions.

As well, the exemptions [9] Congress provided to the definition of "prospectus" in section 2(10) are consistent with the overall policy to ensure full disclosure to purchasers in batch offerings. These provisions permit offerors of securities to provide additional information to potential investors that is not subject to the requirements of section 10 where these communications either merely add to information previously provided the investor in the form of a section 10 prospectus, or clearly "state[ ] from whom a written prospectus meeting the requirements of [section 10] may be obtained."

Therefore reading "prospectus" expansively would be contrary to the definition of the word "prospectus" as defined and used in the 1933 Act. If it had intended an expansive meaning for the term "prospectus", Congress more simply could have drafted section 12(2) to describe all "written or oral communications". See 2A Singer, *Sutherland Stat. Const.* § 47.29 (4th ed. 1984) ("[i]n the absence of legislative intent to the contrary, or other overriding evidence of a different meaning, technical terms or terms of art used in a statute are presumed to have their technical meaning") (footnotes omitted).

As the jury verdict in this case demonstrates, an expansive reading of "oral communication" would permit a buyer to recover under section 12(2) for mere misrepresentations where that same buyer could not meet the scienter, reliance, and causation elements of a section 10(b) claim. Specifically because recovery under section 10(b) requires proof of scienter, mere negligent misrepresentation is not actionable under section 10(b). For a section 10(b) claim, something more, such as fraud, must be proven. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) ("'scienter'—intent to deceive, manipulate, or defraud" is required for a private cause of action under section 10(b) and Rule 10b–5). Section 12(2), on the other hand, makes actionable negligent misrepresentation absent proof of scienter or fraud. Interpreting section 12(2) so that "oral communication" refers to both initial and secondary trading, then, would create an anomaly in that sellers in the aftermarket would be liable only for oral and not written misrepresentations because the term "prospectus" is limited to initial offerings. Legg Mason would thus be liable only for Batten's oral misrepresentation made over the "squawk box", but not for the three written reports containing the same misrepresentations. This distinction makes no logical sense.

## III.

### A.

We have to this point limited our examination to the language of section 12(2) alone to conclude that it should not be expanded to aftermarket trading. In addition, the "object and structure of the Act as a whole" support this interpretation based upon the maxim *noscitur a sociis. See Dole v. United Steelworkers of America,* —— U.S. ——, 110 S.Ct. 929, 935, 108

---

9. Congress provided two exemptions to the definition of prospectus in section 2(10): (1) a communication provided to the investor after the date of registration if a prior written prospectus had been furnished to that investor, and (2) a notice, circular, advertisement, letter or communication which refers to a section 10 prospectus and does no more than identify the security, its price, and by whom orders will be executed. 15 U.S.C. § 77b(10).

L.Ed.2d 23 (1990) (reviewing legislative purpose and structure to interpret phrase).

The "object" of the 1933 Act informs our view of section 12(2). During the aftermath of the 1929 stock market crash, Congress sought to stabilize the market and reduce fraud through the passage of the Securities Act of 1933 and the Securities Exchange Act of 1934. *See* H.R.Rep. No. 85, 73d Cong., 1st Sess. 1, 2 (1933); Conference Report, H.R.Rep. No. 1838, 73d Cong., 2d Sess., 1 (1934). Together these statutes regulate both initial issuances and aftermarket trading of securities. *Hochfelder*, 425 U.S. at 195, 96 S.Ct. at 1382. Neither statute preempts recovery under either common law. 15 U.S.C. § 77p.

With the Securities Act of 1933, Congress sought to establish safeguards for investors in batch offerings of securities by establishing registration and disclosure requirements designed in part to protect investors from fraud and to promote ethical standards of honesty and fair dealing. *Hochfelder*, 425 U.S. at 195, 96 S.Ct. at 1382. The Securities Exchange Act of 1934, on the other hand, was enacted "to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets and for other purposes." *In Re Data Access Systems Sec. Litigation*, 843 F.2d 1537, 1548 (3d Cir.), cert. den. sub nom., *Vitiello v. I. Kahlowsky & Co.*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988).[10] While Congress intended that *both* statutes would protect investors against fraud, *Data Access*, 843

F.2d at 1548, the more specific intent with respect to the 1933 Act controls here where the statutory language requires a restrictive reading and Congress did not express a contrary intent.[11]

Congress' intent in enacting the 1933 Act was clearly to regulate initial offerings. In the House Report accompanying the 1933 Act, the legislators specifically stated:

> The bill affects only new offerings of securities sold through the use of the mails or of instrumentalities of interstate or foreign transportation or communication. It does not affect the ordinary redistribution of securities unless such redistribution takes on the characteristics of a new offering by reason of the control of the issuer possessed by those responsible for the offering.

H.R. No. 85, 73d Cong., 1st Sess. 7 (1933); *see also*, *e.g.*, *Panek v. Bogucz*, 718 F.Supp. 1228, 1232 (D.N.J.1989) (noting the thrust of the 1933 Act to offer protection to investors in initial offerings); *Mix v. E.F. Hutton & Co., Inc.*, 720 F.Supp. 8, 12 (D.D.C. 1989) (citing *United States v. Naftalin*, 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), to describe purpose of 1933 Act to prevent fraud in initial distributions); *Ralph v. Prudential–Bache Sec., Inc.*, 692 F.Supp. 1322, 1324 (S.D.Fla.1988) (same). Nothing in the legislative history or structure of the 1933 Act indicates that Congress intended to broaden section 12(2) beyond the Act's principal purpose of regulating the distribution of new offerings. *Cf. Mix*, 720 F.Supp. at 8 (holding section 12(2) restricted to initial distributions absent clear congressional mandate to read section 12(2) expansively).

---

**10.** While the Acts generally address initial (1933) and secondary distributions (1934), we have noted that the 1934 Act consisted of two parts: amendments to the 1933 Act and the Securities Exchange Act of 1934. *Data Access,* 843 F.2d at 1548.

**11.** We are persuaded by the guidance of the Supreme Court that

> generalized references to the "remedial purposes" of the securities [acts] will not justify reading a provision "more broadly than its language and the statutory scheme reasonably permit."

*See Aaron v. SEC,* 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980) (citations omitted) (holding that the SEC is required to prove scienter in an action brought under section 17(a)(1) but not sections 17(a)(2) and (3)); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (invoking the remedial purposes of the 1934 Act does not justify reading a private right of action into section 17(a)); *SEC v. Sloan,* 436 U.S. 103, 116, 98 S.Ct. 1702, 1710, 56 L.Ed.2d 148 (1978) (rejecting the suggestion that section 12(k) of the 1934 Act should be construed to permit a more "satisfactory remedy" absent support in its language and the statutory scheme).

In addition, the "structure" of the Act supports the more narrow reading of section 12(2). *See Dole,* —— U.S. ——, 110 S.Ct. at 935, 936 (looking to language and import of other statutory provisions). Section 12(2) follows section 11 and section 12(1), which govern the registration of securities and create civil liability for sales of unregistered securities, respectively, and appears before section 13, which provides the statute of limitation for both sections 11 and 12. All of these sections deal with initial distributions. 15 U.S.C. §§ 77k, 77*l*(1). Congress' placement of section 12(2) squarely among 1933 Act provisions concerned solely with initial distributions of securities indicates that it designed section 12(2) to protect buyers of initial offers against fraud and misrepresentation.

### B.

Although the 1933 and 1934 Acts generally regulate initial distributions and secondary trading of securities respectively, two antifraud provisions, section 17(a) of the 1933 Act and section 10(b) of the 1934 Act, explicitly apply to *all* trading. The investors urge us to extend section 12(2) similarly to all markets.

Section 17(a) of the 1933 Securities Act, 15 U.S.C. § 77q(a), proscribes fraudulent conduct and makes it a crime. *Wilko v. Swan,* 127 F.Supp. 55, 58 (S.D.N.Y.1955); *see* Steinberg, Section 17(a) of the Securities Act of 1933 after *Naftalin* and *Redington,* 68 Geo.L.Rev. 163, 177 (1979). Because the language of section 17(a)(2) and of section 12(2) is similar, these sections have been referred to as civil and criminal analogues. Since the Supreme Court has held Section 17(a) applicable to secondary markets, the investors urge that by analogy section 12(2) ought also to be interpreted expansively. *United States v. Nafta-*

*lin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). We decline this suggestion, however, because the language of the two sections differs materially and we do not find the reasoning of the Supreme Court for expanding the reach of section 17(a) applicable to section 12(2).

Although some of the language of section 17(a)(2), making unlawful certain conduct "by means of any untrue statement [or omission] of a material fact ..." closely parallels sections 12(2)'s language, there are important and significant differences. Section 17(a) lacks the phrase "prospectus or oral communication" contained in section 12(2) and instead proscribes, as unlawful, conduct employed *directly or indirectly* ... to obtain money or property by means of any untrue statement...." 15 U.S.C. § 77q(a) (emphasis added). These words— "directly or indirectly"—convey a legislative intent to encompass all conduct meeting the other elements of a section 17(a) claim. The words "prospectus or oral communication," in contrast, do not encompass the universe of methods as do "directly and indirectly." In fact, inclusion of "prospectus or oral communication" in section 17(a) would eviscerate the word "indirectly".[12]

We are also convinced that the reasons underlying the *Naftalin* holding that section 17(a) of the 1933 Act applies to both initial and aftermarket transactions do not apply to section 12(2). In *Naftalin,* the Court found that "[n]othing on the face of the statute" supported Naftalin's reading that section 17(a)(1) applied only to initial distributions of stock; the statutory language, according to the Court, made "no distinction" between initial and secondary tradings. *Naftalin,* 441 U.S. at 778, 99 S.Ct. at 2084. Naftalin's suggestion that the phrase "upon a purchaser" in section

---

**12.** Section 17(a) reads in its entirety:
It shall be unlawful for any person in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, *directly or indirectly*—
(1) to employ any device, scheme, or artifice to defraud, or
(2) to obtain money or property by means of any untrue statement of a material fact or

any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.
15 U.S.C. § 77q(a) (1976) (emphasis added).

17(a)(3) should be grafted onto section 17(a)(1) to exclude secondary tradings was rejected; each subsection "proscribes a distinct category of misconduct" as evidenced by use of the conjunctive "or". *Naftalin*, 441 U.S. at 773, 774, 99 S.Ct. at 2081, 2082. Moreover, Congress made its intent for unrestricted use of section 17(a) explicit in the legislative history: "[t]he Act subjects the sale of old or outstanding securities to the same criminal penalties and injunctive authority for fraud, deception, or misrepresentation as in the case of new issues put out after the approval of the act." *Naftalin*, 441 U.S. at 778, 99 S.Ct. at 2084 (quoting S.Rep. No. 47, 73d Cong., 1st Sess., 4 (1933)).

In contrast to section 17(a), section 12(2) has no such clear legislative mandate. The legislative history is devoid of any indication that the reach of section 12(2) was intended to be broader than the limited scope of sections 11 and 12(1). Although Congress specifically stated that the antifraud provision of section 17(a) was meant to reach secondary markets as well as initial distributions, it failed to make the same application with respect to section 12(2). We recognize that legislative history can be a legitimate guide to discovering a statutory purpose obscured by ambiguity, but "[i]n the absence of a 'clearly expressed legislative intention to the contrary,' the language of the statute itself 'must ordinarily be regarded as conclusive....'" *United States v. James*, 478 U.S. 597, 606, 106 S.Ct. 3116, 3121, 92 L.Ed.2d 483 (1986) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).

The language of section 12(2) is more narrowly drawn than that of section 17(a). The plain words, "directly or indirectly" and *"any* device" of section 17(a), differ from the specific "prospectus or oral communication" language of section 12(2). Had Congress intended section 12(2) to extend to liability for secondary transactions, it could have preceded "oral communication" with "any" and explicitly stated its special intent in the legislative history. The fact that the pertinent legislative history concerning section 12 makes no distinction between section 12(1) and section 12(2) with respect to their application to initial offerings, as opposed to aftermarket trading, contrasts with the clear legislative intent concerning the scope of section 17(a).

## C.

In concluding that section 12(2) claims apply only to initial offerings, we are mindful that the 1933 and 1934 Acts should be construed *in pari materia*, that is, as coordinating statutes which contain some overlapping provisions. *See Herman & McLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983) (sections that address "different types of wrongdoing," may prohibit some of the same conduct). Nevertheless, one provision should be narrowly interpreted, when consistent with legislative intent, so as not to eviscerate requirements for recovery under another complementary provision. As the verdict in this case particularly demonstrates, the application of section 12(2) to secondary trading would permit purchasers of securities to prevail against sellers in instances where those purchasers cannot recover under section 10(b) of the Securities Exchange Act of 1934.

Under section 10(b) and its implementing rule, 10b–5, a purchaser of securities may bring a private cause of action. *Hochfelder*, 425 U.S. at 195–197, 96 S.Ct. at 1382–84; *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The elements of proof required and damages recoverable under section 10(b), however, differ substantially from those of section 12(2). In contrast to section 10(b), section 12(2) requires no proof of scienter or reliance, and embodies a more relaxed standard of causation. If it were determined that section 12(2) applies to secondary market trading, the more lenient requirements of section 12(2) would effectively eliminate the use of section 10(b) by securities purchasers.[13] Such a construc-

---

**13.** It is for this reason that we find the investors' reliance on *Herman & McLean v. Huddleston*,

tion would overrule, *sub silencio*, section 10(b) as a remedy for purchasers.

The different remedies available under section 12(2) and section 10(b), also indicate that section 12(2) should be restricted to initial distributions. Section 12(2) provides for rescissionary damages, *Pinter v. Dahl*, 486 U.S. 622, 641 n. 18, 108 S.Ct. 2063, 2076 n. 18, 100 L.Ed.2d 658 (1988), and section 10(b) permits recovery only of actual damages, *see Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). There is good reason why sellers in initial distributions should be liable for rescissionary damages. These sellers receive the full purchase price from the investors and are the investors' sole source of information concerning the value of the security. The same is not true of sellers in the aftermarket, such as Legg Mason, who receive only a commission and who are not the investors' sole source of information concerning the value of the stock.

These differing remedies are also entirely consistent with the legislative purpose of promoting full disclosure in securities distributions as well. Because misrepresentations in initial offerings can influence the purchase price of securities, rescissionary damages are appropriate to make an investor whole and deter any negligence on the part of a seller of batch offerings. Conversely, a misrepresentation by a broker (although perhaps not by others) in the secondary market is less likely to affect the price of a security and so should not be so heavily penalized. The difference between

the "more pro-plaintiff oriented damages" under section 12(2) is illustrated clearly in this case where the investors prevailed only under their section 12(2) claim with its lesser proof requirements, yet were awarded potentially greater damages than those recoverable under section 10(b).[14] *See Hoxworth*, 903 F.2d at 203, 203 n. 25 (contrasting damages under section 12(2) and section 10(b)). We are convinced that the different remedies available under section 10(b) and section 12(2) support restricting the application of section 12(2) to initial distributions.

In sum, the language and legislative history of section 12(2), as well as its relationships to sections 17(a) and 10(b) within the scheme of the 1933 and 1934 Acts, compel our conclusion that section 12(2) applies only to initial offerings and not to aftermarket trading.

## IV.

Given our ruling concerning section 12(2) which will reverse the judgment in favor of the investors, we must now address the investors' cross-appeal in order to determine whether the investors are entitled to a new trial in which the jury is instructed on an agency theory of section 10(b) liability. The essence of this theory is that John Burke, as broker for the investors, was the agent of both Legg Mason and of his investor-clients. Legg Mason is subject to liability under section 10(b) of the 1934 Act if it misrepresented a material fact to Burke and Burke relied upon that misrepresenta-

459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), to be misplaced. In *Huddleston*, the Supreme Court found section 10(b) applicable to conduct also covered by section 11 of the 1933 Act, rejecting the contention that any overlap between the two provisions would be fatal to the viability of the section 10(b) claim. *Huddleston*, 459 U.S. at 382, 383, 103 S.Ct. at 687, 688. In *Huddleston*, the availability of a remedy under section 10(b) did not render section 11 superfluous because section 11, with its negligence standard of proof, remained available to the plaintiff who could not make a claim under section 10(b) for lack of the scienter element. Some overlap, limited to cases where scienter can be proven, is not inconsistent with the purposes of the securities acts.

Yet here the investors propose not merely some overlap, but as the verdict clearly indicates, an application of section 12(2) which would render superfluous any claim for the same grievance under section 10(b) with its more stringent burdens of proof. This would provide to purchasers of securities in secondary markets, a section 12(2) remedy to plaintiffs unable to prove section 10(b) elements of scienter, reliance and causation.

**14.** Because the investors did not prevail on their section 10(b) claim, "actual" damages were not determined although Legg Mason did argue that independent market forces, such as the October 19, 1987, stock market crash, contributed to the investors' losses.

tion when inducing his investor-clients to purchase Wickes securities.

Before the district court, the investors requested the following jury instruction:

### Misrepresentations Made To Agent

Under the law, a broker is considered to be an agent of his or her customers. An agent is a person who has the power and authority to act on behalf of another person who is called a principal.

The law also provides that if a third party makes misrepresentations to an agent, and the agent relies upon the false statements in entering into a transaction on behalf of his or her principal, then the principal can have the transaction set aside even though it was the agent who was actually defrauded.

In this case, I charge you that as a matter of law John Burke was acting as the agent for all plaintiffs at the time they purchased securities in Wickes.

If you find that Legg Mason made misrepresentations to John Burke, and that John Burke relied upon those misrepresentations in deciding whether to induce his customers to purchase Wickes, then you may find Legg Mason liable under Count I of the complaint even if you find that some of the plaintiffs did not in fact rely upon the misrepresentations regarding the book value of Wickes stock.

The district court, however, over the investors' timely objections, declined to submit this instruction to the jury.

■ We begin with the oft-stated principle that in order for a party to have its requested instruction given, there must be evidence in the record supporting its sub-

mission. *Edwards v. City of Philadelphia*, 860 F.2d 568, 575 n. 7 (3d Cir.1988); *DiRago v. American Export Lines, Inc.*, 636 F.2d 860, 867 (3d Cir.1981). Additionally, a requested instruction reflecting a party's theory of its case must be legally correct. *Gander v. Mr. Steak of Sun Ray, Inc.*, 774 F.2d 920, 924 (8th Cir.1985).

■ Nonetheless, there is a third step which may assist us in resolving this claim of error—assuming without deciding that the evidence adduced at trial supported the investors' requested instruction and that the requested instruction was legally correct, we turn to whether the district court's refusal to give the investors' requested agency instruction constituted harmless error.[15]

The essence of the investors' cross-appeal is that without the requested agency instruction the jury could have concluded that the investors' inability to establish direct personal communication with Batten precluded the imposition of liability under section 10(b). If, however, the district court *had* given the agency instruction, proof of direct reliance by the investors would not have been necessary because Burke testified that *he* had relied upon Batten's misrepresentations.

According to the uncontested jury instruction given with respect to section 10(b)[16], the investors were required to prove the following five elements in order to establish a section 10(b) violation:

1. Legg Mason used the mails or an instrumentality of interstate commerce, or a facility of a national securities exchange, in connection with the purchase or sale of securities;

---

**15.** Rule 61 of the Federal Rules of Civil Procedure provides with respect to harmless error as follows:

No error ... in anything done or omitted by the court or by any of the parties is ground for ... vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Fed.R.Civ.P. 61. In making a non-constitutional "harmless error" determination, the court must have a sure conviction that the error did not prejudice a party, but it need not disprove every reasonable possibility of prejudice. *United States v. Jannotti*, 729 F.2d 213, 219–20 n. 2 (3d Cir.1984).

**16.** The jury instruction was given substantially in accordance with the instruction set forth in Devitt, Blackmar and Wolff, Federal Jury Practice and Instructions, Civil § 101.02, at 847–48 (1987).

2. In connection with such purchase or sale, Legg Mason made some untrue statements of material fact, or omitted to state a material fact necessary in order to make the statements which were made, in light of the circumstances under which they were made, not misleading;

3. Legg Mason acted with scienter;

4. The plaintiffs justifiably relied upon Legg Mason's conduct; and

5. The plaintiffs suffered damages as a result of Legg Mason's conduct.

With respect to this section 10(b) claim, the jury rendered a verdict in favor of Legg Mason and against the investors and John Burke, their broker. The verdict against John Burke indicates that Burke failed to meet his burden of proof with respect to at least one of the five elements of the section 10(b) claim. Therefore, in light of the fact that Burke was not able to make out a successful section 10(b) cause of action against Legg Mason, we must determine whether the investors could possibly have met their burden under an agency theory.

We have reviewed each of the five section 10(b) elements and have assumed that each was the sole basis upon which the jury relied in rendering a verdict against Burke. We conclude that the investors would have necessarily failed in meeting their burden even under their agency theory.

By virtue of a stipulation, the first element of the investors' section 10(b) case was not at issue (that Legg Mason used the mails or an instrumentality of interstate commerce or a facility of a national securities exchange in connection with the purchase or sale of securities). If the jury found that the requirements of element two were not applicable to Legg Mason's conduct (no untrue statement or omission), it would necessarily have found for Legg Mason under the agency theory as well. If, in evaluating the third factor, the jury concluded that Legg Mason did not act with scienter, then an agency instruction would not have cured this defect. With respect to the fourth element, if the jury determined that Burke did not justifiably rely upon Legg Mason's conduct, there could have been no derivative reliance. Consequently, an agency instruction would have been of no benefit to the investors. Finally, if the jury concluded that Burke suffered no damages as a result of Legg Mason's conduct (the fifth element), an agency instruction could not have influenced the verdict.

Because we conclude that the agency theory could not possibly have provided an alternative basis for liability, the district court's failure to give an agency instruction was harmless error at most.

### V.

For the reasons detailed above, we hold that the remedy provided by section 12(2) is limited to initial distributions. Furthermore, we find no reversible error in the district court's refusal to give the investors' requested agency instruction. Accordingly, we will reverse the judgment of the district court with respect to the section 12(2) count and remand for the entry of judgment for Legg Mason. With respect to the section 10(b) count, we will affirm the judgment in favor of Legg Mason.