In re ADAMS GOLF, INC. SE-
CURITIES LITIGATION.

No. 99–371–RRM.

United States District Court,
D. Delaware.

Dec. 10, 2001.

Joseph A. Rosenthal and Carmella P. Keener, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Todd S. Collins and Jacob A. Goldberg, Berger & Montague, P.C., Philadelphia, Pennsylvania; Donald B. Lewis, Law Offices of Donald B. Lewis, Bala Cynwyd, Pennsylvania; Jeffrey P. Bates, Abrahams, Lowenstein, Bushman & Kauffman, P.C., Philadelphia, Pennsylvania; and Kurt Olsen, The Olsen Law Firm, Washington, D.C.; counsel for F. Kenneth Shockley, M.D., David Shockley, John M. and Sandra M. Morrash, and Patricia Clement.

Kevin G. Abrams and J. Travis Lester, Richards, Layton & Finger, Wilmington, Delaware; Daniel J. Tyukody, Jr., Paul R. Bessette, James A. Lico, and Ted F. Angus, Brobeck, Phleger & Harrison LLP, San Francisco, California; counsel for Adams Golf Inc., B.H. (Barney) Adams, Richard H. Murtland, Darl P. Hatfield, Paul F. Brown, Jr., Roland E. Casati, Finis F. Conner, and Stephen R. Patchin.

Robert K. Payson and John E. James, Potter Anderson & Corroon LLP, Wilmington, Delaware; Robert Cusumano, Karen Cestari, and Vivian Lee Brady, Simpson Thacher & Bartlett, New York City; counsel for Lehman Brothers Holdings, Inc., Banc of America Securities LLC, and Ferris Baker Watts Incorporated.

## OPINION

McKELVIE, District Judge.

This is a securities case. Plaintiffs F. Kenneth Shockley, M.D., David Shockley, John M. Morrash, Sandra M. Morrash, and Patricia Clement are the lead plaintiffs of an uncertified class consisting of shareholders who purchased shares of Adams Golf, Inc. common stock in, or traceable to, its July 1998 Initial Public Offering ("IPO"). Each lead plaintiff purchased at least part of his or her Adams Golf stock within twenty-five days of the effective date of the of the Registration Statement and the Prospectus that were filed prior to the IPO. There are two groups of defendants. One is composed of parties related to Adams Golf (the "Adams Golf defendants"), and the other composed of the underwriters of the company's IPO (the "Underwriter defendants").

The Adams Golf defendants include the following parties. Defendant Adams Golf, Inc. is a Delaware corporation with its principal executive offices in Wilmington, Delaware. Adams Golf designs, manufactures and markets golf clubs. Defendant B.H. Adams, the founder of Adams Golf, is an officer and director of the company. Defendants Darl P. Hatfield and Richard H. Murtland are officers of the company. Defendants Paul R. Brown, Jr., Ronald E. Casati, Finis F. Conner, and Stephen R. Patchin are directors of the company.

The Underwriter defendants include Lehman Brothers Holdings Inc., Banc of America Securities LLC, and Ferris Baker Watts, Incorporated, the lead underwriters for the IPO.

In their consolidated and amended class action complaint, plaintiffs assert claims pursuant to Sections 11, 12 and 15 of the Securities Act of 1933 ("the '33 Act"), 15 U.S.C. §§ 77k, 77$l$(a)(2) and 77o, which allege that, in connection with the IPO, defendants wrongfully prepared, signed or caused Adams Golf to issue a Registration Statement and an incorporated Prospectus that were materially false and misleading. Specifically, plaintiffs contend that the defendants failed to disclose that Adams Golf's profits and revenues were severely threatened by extensive distribution of Adams Golf's products to unauthorized retailers. That is, the defendants failed to

disclose the existence of what the plaintiffs term a "gray market" for Adams Golf products.

Plaintiffs further contend that defendants failed to disclose that an industry-wide oversupply of retail inventory had weakened sales for at least a full quarter prior to the offering. Plaintiffs argue that certain portions of the Registration Statement and Prospectus were materially misleading with regard to the gray market and oversupply conditions. Plaintiffs allege that as the market learned of these conditions, the per share price of Adams Golf stock dropped from a high of $18.875 to $3.75.

Plaintiffs seek damages from defendants to compensate for the loss in value of their stock. Defendants have moved to dismiss plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the 1995 Private Securities Litigation Reform Act (the "PSLRA") for failure to demonstrate any set of facts that would entitle them to relief.

On January 8, 2001, the court heard oral argument on defendants' pending motions to dismiss. This is the court's decision on the motions to dismiss.

## I. FACTUAL BACKGROUND

The court draws the following facts from plaintiffs' consolidated and amended class action complaint and the documents referenced therein.

In 1987, Barney H. Adams founded Adams Golf. Adams initially started the company as a general golfing components supplier and contract manufacturer, but later developed it into a producer of high-end, custom fit golf clubs. In the fall of 1995, Adams introduced the "Tight Lies Original," the lead product in a new line of high-end golf clubs. The Tight Lies Original was an immediate success. In December 1996, Adams added three fairway woods, the Tight Lies Strong 3, Strong 5, and Strong 7. Adams added the Tight Lies Strong 9 to the product line in January 1998. Adams Golf enjoyed rapid sales growth with the Tight Lies clubs. According to the July 9, 1998 Prospectus, the company's sales increased from $1.1 million in 1995 to $36.7 million in 1997. In the first quarter of 1998, Adams Golf recorded net sales of $24.5 million and held a 27% market share in the single fairway woods category.

On July 10, 1998, Adams Golf executed an IPO. According to the company's July 13, 1998, Securities and Exchange Commission ("SEC") Rule 424(b)(4) filing, the IPO was conducted on a firm commitment basis through the underwriter defendants and consisted of six million shares offered at $16.00 per share. On July 10, 1998, the day after the allegedly misleading Registration Statement and Prospectus became effective, the stock traded publicly on the NASDAQ exchange and closed at $18.375. At oral argument, counsel for plaintiffs stated that two of the lead plaintiffs, F. Kenneth Shockley, M.D. and David Shockley ("the Shockley plaintiffs"), purchased their shares directly from the Underwriter defendants during the IPO. The remaining lead plaintiffs ("the non-Shockley plaintiffs") purchased their shares on the public market soon after the IPO.

The amended complaint charges that the defendants misrepresented and omitted material facts in the July 10, 1998, Adams Golf Registration Statement. Plaintiffs contend that the omissions relate to two material subjects. First, plaintiffs allege that defendants failed to disclose that Adams Golf's profits and revenues were artificially inflated by extensive "gray market" distribution of Adams Golf's products to Costco, an unauthorized discount retailer. Second, plaintiffs allegations infer that

an industry-wide oversupply of inventory at the retail level existed for at least a full quarter prior to the IPO, that the defendants failed to disclose this allegedly material information, and that this industry-wide oversupply has adversely affected Adams Golfs' profits.

### A. Facts Underlying The Allegation of Gray Market Sales Misrepresentation

At some point before the IPO, personnel at Adams Golf learned that certain Tight Lies products were being sold at Costco, an unauthorized discount retailer. According the plaintiffs, these sales resulted in a "gray market" for the Tight Lies golf clubs. The term "gray market" describes a market condition created by the unauthorized sale of products to discounters willing to resell the products at prices substantially lower than those set by authorized retailers. These discounters use the lower prices to draw consumers away from the authorized retailers. When the consumers purchase the products from the discounters, the profit margins for the distributor of the product are reduced. In addition, according to the complaint, gray markets tend to skew the distributor's revenues, causing higher sales in the earlier periods as products filter to discounters through gray market channels and lower sales in later periods as the authorized retailers, losing sales to discounters, order fewer products from the distributor.

On June 9, 1998, one month before the effective date of the Registration Statement, Adams Golf issued a press release explaining that it had filed a Bill of Discovery against Costco. The press release states, "[t]he bill of discovery was filed in order to determine whether Costco's claims that they had properly acquired Adams' Tight Lies fairway woods for resale were accurate.... Adams Golf became concerned when it learned that Costco was selling their Tight Lies fairway

woods because Costco is not an authorized distributor." At that time, Costco held over 5,000 Adams Golf clubs in its inventory.

According to the plaintiffs, these gray market sales artificially inflated Adams Golf's sales prior to the IPO and damaged the sales after the IPO by reducing the market price for the clubs. Plaintiffs explain that Costco's gray market sales are only one example of sales by unauthorized discounters and international gray market discounters. The Registration Statement and Prospectus did not specifically refer to the gray market. Rather, it stated that "the Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs."

On January 7, 1999, Adams Golf disclosed in a company press release that sales results would continue to be adversely affected as a result of "the gray market distribution of its products to a membership warehouse club." In the company's 1998 Form 10–K Report, filed with the SEC in March 1999, the Adams Golf disclosed that:

> Despite the Company's efforts to limit its distribution to selected retailers, Adams Golf products have been found in a certain membership warehouse club, which the Company believes has obtained the products through the use of unauthorized distribution channels. Adams Golf has taken steps to limit this unauthorized distribution through the serialization of all Adams Golf club heads but does not believe the gray marketing of its product can be totally eliminated.

### B. Facts Underlying The Allegation of Failure to Disclose Oversupply of Inventory at Retail Level

According to the plaintiffs, at some point prior to the IPO, personnel at Adams Golf

knew that there was an industry-wide problem of "oversupply of inventory at the retail level." Plaintiffs contend that the Registration Statement and the Prospectus failed to disclose this "debilitating" industry wide oversupply condition, a condition that existed prior to the time of the IPO. Rather, the Registration Statement and the Prospectus represented that:

> In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at an estimated compound annual growth rate of approximately 13% over the 5–year period from 1992 to 1997. The Company believes that a number of trends are likely to further increase the demand for Adam's products . . . .

In addition, it is alleged that while the Registration Statement and the Prospectus disclosed a number of risks relating to competition and industry factors, it nowhere disclosed the allegedly material risks flowing from the then-current oversupply of inventory at the retail level either for Adams Golf itself or throughout the golf equipment industry. Rather, the plaintiffs argue, Adams Golf misled investors into believing that Adams Golf retailers would not suffer from excess inventory by stating in the Registration Statement and the Prospectus that "[t]he Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers."

Defendants first indicated to the public that retailers were carrying excess inventory on January 7, 1999, when, in connection with disappointing financial results, Adams Golf disclosed in a company press release that it would offer credits to its retailers, at the cost of millions of dollars, in an attempt to alleviate the problems arising from those retailers' excess inventory.

Then in an April 12, 1999 press release, with reference to results for the quarter that ended on March 31, 1999, Adams Golf disclosed for the first time that "Adams Golf believes the oversupply of inventory at the retail level, a condition that has weakened club sales industry wide over the last 12 months, has resulted in substantial reductions in retailer purchases." According to the amended complaint, one can infer from that statement that the undisclosed oversupply condition existed for at least one quarter before Adams Golf's IPO on July 10, 1998.

## II.  PROCEDURAL BACKGROUND

On April 25, 2000, the court appointed plaintiffs as lead plaintiffs of the as yet uncertified class. The lead plaintiffs filed their consolidated and amended class action complaint on May 17, 2000.

On July 6, 2000, the Adams Golf defendants moved to dismiss plaintiffs' consolidated and amended complaint on four grounds. On July 11, 2000, the Underwriter defendants moved to dismiss the complaint on essentially the same grounds. First, the defendants contend that only the particular plaintiffs who purchased shares of Adams Golf in the IPO have standing to assert claims under sections 11(a) and 12(a)(2) of the '33 Act and, therefore, the claims of all plaintiffs that have not purchased shares directly from the Underwriter defendants should be dismissed pursuant to Federal Rule of Civil Procedure 12(c).

Second, the defendants contend that the plaintiffs also failed to plead a section 11 or section 12(a)(2) violation with the particularity required by the PSLRA.

Third, the defendants contend that the plaintiffs failed to plead their claims under

sections 11 and 12(a)(2) of the '33 Act with the particularity required by Federal Rule of Civil Procedure Rule 9(b) for claims sounding in fraud. Because the plaintiffs, in their amended complaint, specifically state that claims do not allege fraud, this ground for dismissal will require the court to determine if the amended complaint nonetheless sounds in fraud.

Last, the defendants contend that the plaintiffs' allegations that the Registration Statement contained material misrepresentations or omissions fail to state a claim under sections 11 or 12(a)(2) of the '33 Act and, as such, the amended complaint should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In connection with its argument that the complaint fails to state a claim, the Adams Golf defendants further argue that the plaintiffs have failed to allege facts demonstrating that defendants qualify as "statutory sellers," as required for plaintiff's section 12(a)(2) claim and that the plaintiffs have failed to allege facts demonstrating that defendants qualify as "control persons," as required for plaintiff's section 15 claim.

## III. *DISCUSSION*

The court's discussion is parsed into four main sections below. First, the court sets forth the proper legal standard for a motion to dismiss. After summarizing the legal underpinnings of plaintiffs' three claims, the court next addresses the threshold issue of standing. The court then considers the procedural issue of whether plaintiffs' have pleaded their allegations with sufficient particularity. Last, the court addresses the substantive issue of whether the complaint states a claim under the '33 Act.

### A. *Standard of Decision*

Under Rule 12(b)(6), a count of a complaint may be dismissed for failure to state a claim upon which relief may be granted only if, when accepting all of the plaintiffs' factual allegations as true and drawing all reasonable inferences from these facts in favor of the plaintiffs, no relief would be granted under any set of facts that could be proved. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

### B. *Summary of Plaintiffs' Claims*

Plaintiffs' consolidated and amended complaint asserts violations of §§ 11, 12(a)(2), and 15 of the '33 Act. Passed in the aftermath of the stock market crash of 1929, the '33 Act creates federal duties, most of which relate to registration and disclosure obligations, in connection with public offerings. *See Gustafson v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 195, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("The Securities Act of 1933 ... was designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."); *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 690 (3d Cir.1991) (citing *Hochfelder,* 425 U.S. at 195, 96 S.Ct. 1375).

### 1. *Section 11 of the '33 Act*

■ Section 11 of the '33 Act creates a private cause of action for "any person acquiring [a] security" for which a registration statement contained an untrue statement of material fact or an omission of a material fact that is required to be stated therein or necessary to make the statements therein not misleading. 15 U.S.C. § 77k(a). A § 11 claim can be

brought against every person who signed the registration statement, the issuer of the securities, the issuer's directors or partners, the underwriters of the offering, and accountants named as having prepared or signed the registration statement. *Id.* According to the statutory language, a § 11 plaintiff does not need to establish a defendant's scienter, or even negligence. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 382, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

#### 2. *Section 12(a)(2) of the '33 Act*

■ Section 12(a)(2) of the '33 Act creates a private cause of action against persons who offer or sell a security "by means of a prospectus or oral communication" that includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements not misleading. 15 U.S.C. § 77*l*(a)(2). Liability under this section extends to those who transfer title to the security and to those who successfully solicit the purchase based on direct and active solicitation. *Id.; In re Craftmatic Sec. Litig.,* 890 F.2d 628, 636 (3d Cir.1989) (citing *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), and adopting its interpretation of the scope of "seller" to include one who solicits the sale as used in section 12(1) for the purposes of 12(a)(2)); *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 717 n. 19 (3d Cir.1996) (discussing requirement that solicitation be active and direct). Like § 11, there is no requirement under § 12 that a plaintiff show defendant's scienter or negligence. *Gustafson,* 513 U.S. at 582, 115 S.Ct. 1061; *Westinghouse,* 90 F.3d at 717 n. 20.

#### 3. *Section 15 of the '33 Act*

Section 15 of the '33 Act extends liability under §§ 11 and 12 to cover "control" persons. Specifically, § 15 provides that any person who, "by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise," controls any person subject to liability under §§ 11 or 12 may also be jointly and severally liable to the same extent as the controlled person, unless the controlling person "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77*o*. Section 15 liability, therefore, is predicated on a primary violation of § 11 or § 12 by a controlled person. *See id.*

#### C. *Do the Non–Shockley Plaintiffs Have Standing to Sue Under Sections 11 or 12(a)(2) of the '33 Act?*

Plaintiffs have stated that the Shockley plaintiffs are the only plaintiffs who purchased their Adams Golf shares in the IPO, at the IPO price, directly from the underwriter defendants. Defendants contend that the remainder of the lead plaintiffs, who did not purchase shares in the IPO but instead purchased their shares in the secondary market, lack standing to bring claims under §§ 11 and 12(a)(2).

Because the language of the two sections is distinct and thus has been analyzed differently by the majority of courts that have addressed the issue of standing, the court will address the standing argument with respect to each of the sections separately. *See* 15 U.S.C. § 77*l*(a) (statutory language of § 12(a)(2) requires privity by limiting seller's liability "to the person purchasing such security *from him* ") (emphasis added); 15 U.S.C. § 77k (broader statutory language of § 11 contains no privity requirement and more broadly provides that "*any person* acquiring such security*" may bring suit); *See, e.g., Hertz-*

*berg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1081 (9th Cir.1999) ("while Section 11 and Section 12 are indeed parallel statutes, their wording is significantly different as to who can bring a suit"); *Joseph v. Wiles,* 223 F.3d 1155, 1161 (10th Cir.2000) (analyzing Sections 11 and 12 separately).

### 1. *Do the non-Shockley plaintiffs have standing under section 12(a)(2) of the '33 Act?*

■ Defendants argue that according to both the Supreme Court in *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), and the Third Circuit in *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3d Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991), claims under § 12(a)(2) are limited to initial distributions of securities (in this case, the IPO) and, therefore, § 12(a)(2) claims that are brought by plaintiffs who purchased securities on the secondary market must be dismissed. Plaintiffs seek to distinguish *Gustafson* and *Ballay* from the instant case and argue that these cases do not divest them of § 12(a)(2) standing. As set forth more fully below, the court finds that the holdings of *Gustafson* and *Ballay* mandate that the non-Shockley plaintiffs lack standing to bring claims under § 12(a)(2).

In *Ballay,* investors who bought market securities from Legg Mason sued the brokerage firm for alleged oral misrepresentations concerning the book value calculation of securities that they sold. The district court entered judgment on a jury verdict, awarding investors damages on their claim under § 12(2) of the '33 Act.[1] On appeal, the Third Circuit, after re-

viewing the language and legislative history of § 12(2), held that § 12(2) does not afford a remedy to a buyer of securities in the secondary market, but was designed to provide a remedy only to buyers of securities at the initial distribution. *Ballay,* 925 F.2d at 684. The *Ballay* court determined that § 12(2)'s language requiring that the defendant sold a security through a "prospectus or oral communication," refers only to the transmittal of information concerning the sale of the security in an initial distribution. *Id.* at 688. To further bolster its statutory interpretation, the Third Circuit went on to note that the congressional object of the '33 Act was to regulate initial issuances, while the Exchange Act of 1934 ("the '34 Act") was intended to regulate the secondary trading of securities. *Id.* at 690.

In *Gustafson,* the Supreme Court considered the standing issue under § 12(2). The plaintiffs, sole shareholders of a privately held corporation, purchased shares of stock from the sellers, pursuant to a private sale contract. They brought suit under § 12(2), seeking rescission of the sale agreement on the ground that the written sale agreement was a "prospectus" within the meaning of § 12(2) and contained material misstatements. Relying on the Third Circuit's decision in *Ballay,* the district court granted the defendants' summary judgment motion, holding that "§ 12(2) claims can only arise out of initial stock offerings" and not from a private sale agreement. The Court of Appeals vacated the judgment and remanded the case in light of its holding that the inclusion of the term "communication" in the '33 Act's definition of prospectus meant

---

**1.** There is no substantive difference between a § 12(2) claim and a § 12(a)(2) claim; both refer to the same statute that was renumbered in 1995 when Congress added another subsection to § 12. *See* Private Securities Litiga-

tion Reform Act of 1995, Pub.L. No. 104–67, § 105, 109 Stat. 737, 757 (codified at 15 U.S.C. § 77*l*). Therefore, § 12(2) claims now are numbered as § 12(a)(2) claims.

that prospectus includes all written communications offering a security for sale. The Supreme Court reversed the Court of Appeals, and adopted the *Ballay* court's interpretation of the word prospectus as "a term of art referring to a document that describes a public offering of securities by an issuer or controlling shareholder." *Gustafson*, 513 U.S. at 584, 115 S.Ct. 1061.

Plaintiffs urge this court to adopt a narrow reading of the holding of *Gustafson* and argue that the language defendants rely on from the opinion is dicta. Specifically, plaintiffs contend that because of its factual context, *Gustafson* only stands for the proposition that the '33 Act covers offerings of public securities and not private placements. They argue that the holding of *Gustafson* does not distinguish between initial public offerings and later sales of publicly registered securities because the plaintiffs in *Gustafson* were participants in a private offering. Therefore, according to the plaintiffs, all of the reasoning and analysis in *Gustafson* that drove the Court to conclude that § 12(2) applies only to *initial* public offerings and not to private *or secondary sales* is dicta that is not controlling upon this court.

While the argument that *Gustafson's* interpretation of § 12(a)(2) does not bar § 12(a)(2) claims brought by aftermarket purchasers has been adopted by a few courts, *see, e.g. Feiner v. SS&C Technologies, Inc.*, 47 F.Supp.2d 250, 252 (D.Conn. 1999), it has not been adopted by the majority of courts. *See Warden v. Crown Amer. Realty Trust*, No. Civ. A. 96–25J, 1998 WL 725946, *2 (W.D.Pa. Oct.15, 1998); *In re Delmarva Sec. Litig.*, 794 F.Supp. 1293 (D.Del.1992) (pre-*Gustafson* ); *Giarraputo v. UNUMProvident Corp.*, No. Civ. 99–301–PC, 2000 WL 1701294, *9 (D.Me. Nov.8, 2000).

Even if the court were to adopt the plaintiffs' argument that *Gustafson* does not preclude the non-Shockley plaintiffs' § 12(a)(2) claims, *Ballay* remains the controlling law in the Third Circuit and compels the court to find that the non-Shockley plaintiffs do not have standing under § 12(a)(2). As the defendants point out, the precise issue framed by the *Ballay* Court was "whether section 12(2) of the Securities Act of 1933 affords a remedy to a buyer of securities in the secondary market." *Ballay*, 925 F.2d at 684. The *Ballay* Court held that "Section 12(2) applies only to initial offerings and not to aftermarket trading." *Id.* at 693. This holding was not disturbed by the Supreme Court's opinion in *Gustafson;* rather the *Gustafson* Court cited *Ballay* with approval. *Gustafson*, 513 U.S. at 566, 115 S.Ct. 1061.

This court, therefore, finds that the non-Shockley plaintiffs do not have standing to bring their § 12(a)(2) claims and will dismiss that claim as to those plaintiffs.

2. *Do the non-Shockley plaintiffs have standing under section 11 of the '33 Act?*

Defendants next contend that the non-Shockley plaintiffs lack standing under § 11, arguing, as they did with respect to § 12(a)(2), that § 11 relief is only available to those individuals who purchase their shares directly through the IPO subject to the registration statement at issue. They principally base their contentions on dicta in *Gustafson* and *Ballay* stating that, because the two sections share legislative history that indicates that the entire '33 Act was designed by Congress to regulate initial offerings only, the issue of standing with respect to § 11 claims should be interpreted in a manner that is consistent with those courts' interpretation of standing under § 12(a)(2); namely, that secondary market purchasers do not have standing to bring § 11 claims either. *See Gustafson*, 513 U.S. at 572,

115 S.Ct. 1061 ("It is more reasonable to interpret the liability provision of the 1933 Act as designed for the primary purpose of providing remedies for the violations of obligations it had created. Indeed, §§ 11 and 12(1)-the statutory neighbors of § 12(2)afford remedies for violations of those obligations"); *Ballay,* 925 F.2d at 691 ("All of these sections [§§ 11, 12, and 13] deal with initial distributions ... Congress' placement of section 12(2) squarely among the 1933 Act provisions concerned solely with initial distributions of securities indicates that it designed section 12(2) to protect buyers of initial offers against fraud and misrepresentation.").

Although *Ballay,* and arguably *Gustafson,* both decisions that considered only § 12(2), control this court's interpretation of standing under § 12(a)(2), neither holding directly controls the court's interpretation of the standing requirements of § 11.

Each of the Circuit Courts that had directly addressed the scope of § 11 prior to *Gustafson,* had uniformly allowed for recovery under § 11 by purchasers in the secondary market. *See Versyss Inc. v. Coopers & Lybrand,* 982 F.2d 653, 657 (1st Cir.1992) (section 11 imposes liability "for the benefit even of purchasers after the original offering"); *Barnes v. Osofsky,* 373 F.2d 269 (2d Cir.1967); *Columbia Gen. Inv. Corp. v. SEC,* 265 F.2d 559, 562 (5th Cir.1959). However, since *Gustafson,* the issue of whether a plaintiff who purchases on the aftermarket has standing to pursue a § 11 claim has been the subject of much debate in the district courts. Indeed, both parties have pointed to district court opinions that support their position on the issue. *Compare Gannon v. Continental Ins. Co.,* 920 F.Supp. 566, 575 (D.N.J.1996) (holding aftermarket purchasers lacked standing under section 11), *Gould v. Harris,* 929 F.Supp. 353, 358–59 (C.D.Cal.1996) (same) and *McKowan Lowe & Co., Ltd. v.*

*Jasmine Ltd.,* 127 F.Supp.2d 516, 542 (D.N.J.2000) (same) *with Adair v. Bristol Tech. Sys., Inc.,* 179 F.R.D. 126, 130–33 (S.D.N.Y.1998) (holding aftermarket purchasers had standing under section 11) and *In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d. 371, 435–36 (S.D.N.Y.2001) (same) and *Schwartz v. Celestial Seasonings, Inc.,* 178 F.R.D. 545, 555–57 (D.Colo. 1998) (same).

Since *Gustafson,* each Circuit Court that has addressed the issue of whether aftermarket purchasers may proceed under § 11 has determined that they may, so long as the securities were traceable to an offering that was covered by the allegedly false registration statement. *See Joseph v. Wiles,* 223 F.3d 1155, 1158–61 (10th Cir.2000) (holding that aftermarket purchaser of securities has standing to pursue § 11 claim so long as he can prove that the securities he bought were traceable to those sold in an offering covered by the false registration statement); *Hertzberg v. Dignity Partners, Inc.,* 191 F.3d 1076, 1079–82 (9th Cir.1999) (same). Recent scholarly criticism supports this interpretation of the scope of § 11. *See* Brian Murray, Aftermarket Purchaser Standing Under 11 of the Securities Act of 1933, 73 St. John's L.Rev. 633, 650 ("Following an initial flurry of decision after *Gustafson* which limited standing under section 11 to purchasers on an IPO, the more recent and more well-reasoned decisions allow aftermarket purchasers standing to sue under section 11"); *see also* Vincent R. Cappucci, Misreading *Gustafson* Could Eliminate Liability Under Section 11, 218 N.Y.J.L. 1 (Sept. 22, 1997).

This court finds the reasoning that supports decisions such as *Joseph, Hertzberg,* and *Adair* to be persuasive. Therefore, this court will adopt the view that aftermarket purchasers may proceed under

§ 11 so long as they can trace the purchase of their shares to a public offering that is covered by the offending registration statement.

This reading of the scope of § 11 is supported by the text of § 11 itself. Section 11(a) provides that where a registration statement containing material misstatements or omissions accompanies an SEC securities filing, "any person acquiring such security" may bring an action for losses caused by the defect. 15 U.S.C. § 77k(a). Unlike § 12(a)(2), there is no privity requirement and there is no language limiting the claims to those investors who purchase their shares in an initial public offering. Rather, the natural reading of "any person acquiring such security" is that the plaintiff must have purchased, at some point, a security issued under the registration statement at issue.

As noted by the Ninth Circuit in *Hertzberg* and the Tenth Circuit in *Joseph,* this reading is also supported by other portions of § 11. For example, § 11(a), as amended in 1934, requires that a person who acquires the security "after the issuer has made generally available to its security holders an earnings statement covering a period of at least twelve months beginning after the effective date of the registration statement," must prove reliance on the registration statement in order to recover. 15 U.S.C. § 77k(a). In light of this requirement, to interpret § 11 as inapplicable to registered securities that were purchased on the secondary market, would make this section applicable only to continuous offerings that extend beyond twelve months, offerings which were and are quite rare. *Joseph,* 223 F.3d at 1159. Moreover, § 11(e), the section's damages provision, also seems to contemplate that aftermarket purchases of registered securities are covered, when it sets the baseline for damages measurements at "the amount paid for the security (not exceed-

ing the price at which the security was offered to the public)." 15 U.S.C. § 77k(e). Similarly, § 11(g) caps the maximum recoverable damages at "the price at which the security was offered to the public." *Id.* at 77k(g). As noted by the Ninth Circuit, such provisions "would be unnecessary if only a person who bought in the actual offering could recover, since, by definition, such a person would have paid 'the price at which the security was offered to the public.'" *Hertzberg,* 191 F.3d at 1080.

The court's finding that § 11 claims can be brought by aftermarket purchasers who can demonstrate that they purchased their securities pursuant to the registration statement does not frustrate the fundamental distinction between the scope of the '33 Act, which was meant to regulate the initial distribution of securities, and the '34 Act, which regulates trading in the open market. *See, e.g., Gustafson,* 513 U.S. at 571–73, 115 S.Ct. 1061; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 752, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *United States v. Naftalin,* 441 U.S. 768, 777–778, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979). Where plaintiffs can trace their shares to the initial offering, the alleged misrepresentation that violates the '33 Act took place in the public offering, even though the shares were purchased on the open market. *See Joseph,* 223 F.3d at 1159 (citing *Columbia Gen. Inv. Corp.,* 265 F.2d at 562).

Defendants, nonetheless, argue that language from *Shapiro v. UJB Fin. Corp.,* 964 F.2d 272, 286 (3d Cir.1992), indicates that the Third Circuit supports their view that standing under § 11 requires that the plaintiffs purchased their shares in the initial distribution. Specifically, the quoted language in *Shapiro* states that "[i]f plaintiff's shares were purchased in the secondary market, they would not be linked to a registration statement filed during the class period, and the § 11 claim

would fail." *Shapiro*, 964 F.2d at 286. The court finds that the defendants' reliance on this out-of-context statement from *Shapiro* is misplaced; *Shapiro* does not support the proposition that the Third Circuit does not recognize aftermarket purchaser's standing under § 11. Rather, *Shapiro* is an endorsement of the "tracing" theory, and has been so recognized by other courts. *See Joseph*, 223 F.3d at 1160 (citing *Shapiro* when discussing how requiring that aftermarket purchaser to demonstrate that he/she can trace their purchase back to the offending registration statement satisfies the standing requirements of § 11).

First, it should be noted that although defendants cite *Shapiro* for the proposition that a § 11 claim requires the plaintiffs to purchase their shares in the initial public offering, the court in *Shapiro* did not dismiss the plaintiffs' § 11 claim on that ground. Rather, the *Shapiro* court held that if the plaintiffs could prove that they could trace their shares to a false of misleading registration statement, they could recover, even when they did not purchase their shares in the initial offering.

In order to understand the *Shapiro* court's language, one must look to the context of the court's statement. The section of *Shapiro* that precedes and follows the above quoted language is fully set forth below:

> Under § 11 of the Securities Act, any person acquiring a security issued pursuant to a false or misleading registration statement may recover damages. Plaintiffs allege that they purchased UJB stock "pursuant to" a DRISP registration statement. The district court dismissed this claim, holding that although the plaintiffs need not prove their shares are traceable to a false or misleading statement at this early stage of the litigation, they must allege it. We agree that traceability must be alleged,

but our review of plaintiffs' complaint leads us to conclude that this has been done .... At some point, plaintiffs may be able to prove that their DRISP shares came from treasury stock. [Therefore], the § 11 claim cannot be dismissed at this time.

*Id.* at 286.

The confusion about the meaning of *Shapiro* is due to that case's peculiar factual context. In *Shapiro*, the plaintiffs brought claims under §§ 11 and 12(2) alleging that UJB's Dividend Reinvestment and Stock Purchase Plan (the "DRISP") and the accompanying prospectus and registration statement were false and misleading. Under the DRISP, shareholders reinvested their UJB dividends by purchasing additional UJB shares. "Some of these new shares were authorized but previously unissued treasury stock, but others were purchased by UJB in the secondary market." *Shapiro*, 964 F.2d at 285–86. The court in *Shapiro* held that if the DRISP shares could be traced to the treasury stock, they would properly allege their § 11 claim. However, in the statement quoted by the defendants, the court noted that if the plaintiffs were only able to trace their shares to the secondary market shares, *which in this case were shares already issued on the date of the misleading registration statement,* they could not satisfy the tracing requirement and therefore could not bring their § 11 claim.

Accordingly, the court will not dismiss the non-Shockley plaintiffs' § 11 claims based on lack of standing.

D. *Have Plaintiffs Stated Their Claims With Sufficient Particularity Under Federal Rule of Civil Procedure 9(b) and the PSLRA?*

Defendants also assert that the plaintiffs have failed to plead their allegations with the particularity required by Federal Rule

of Civil Procedure 9(b) and the PSLRA. The court will address each of these contentions in turn.

### 1. Have plaintiffs stated their claims with sufficient particularity under Rule 9(b)?

Rule 9(b), in relevant part, provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). Defendants argue that the plaintiffs' allegations of knowing misstatements trigger the specificity requirements of Rule 9(b). Plaintiffs, while acknowledging that Rule 9(b) applies to claims that sound in fraud, argue that their complaint need not and does not sound in fraud; they assert rather that it merely alleges that the Registration Statement and Prospectus negligently or innocently omitted and misstated material facts in violation of §§ 11, 12(a)(2), and 15 of the '33 Act.

■ Plaintiffs are correct that allegations under §§ 11 and 12(a)(2) need not satisfy any statutory scienter requirement; only a material misstatement or omission need be shown. *See Huddleston,* 459 U.S. at 382, 103 S.Ct. 683; *Shapiro,* 964 F.2d at 288; *see also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1223 (1st Cir.1996) ("Fraud is not an element of a claim under either Section 11 or 12(a)(2), and a plaintiff asserting such claims may avoid altogether any allegations of scienter or reliance."). Thus, the heightened pleading requirements of Rule 9(b) do not generally apply to § 11 and 12(a)(2) claims. However, the plain language of Rule 9(b), which covers all "averments" of fraud, extends to cover complaints where the plaintiffs' allegations nonetheless allege that the defendants' actions were fraudulent, intentional, or knowing. *Shapiro,* 964 F.2d at 287–88. Therefore, when a plaintiff's § 11 and 12(a)(2) claims are grounded in fraud, the

pleading requirements of Rule 9(b) apply. The proper inquiry, therefore, focuses on the allegations in the complaint.

■ Reviewing the complaint, the court finds that the plaintiffs merely allege that the IPO offering materials included materially false and misleading statements and omitted to disclose material facts relating to the gray market distribution of Adams Golf products and the oversupply of golf club inventory at the retail level. Nowhere in the complaint do plaintiffs' allegations focus on or even refer to the defendants' state of mind.

This case differs factually from *Shapiro.* There, the plaintiffs' complaint, which alleged violations of both the '33 Act and under the anti-fraud statute, section 10(b) of the '34 Act, consisted solely of references to intentional and reckless conduct and was therefore "devoid of allegations that defendants acted negligently in violating Sections 11 and 12(2)." *Id.* at 288. The same set of facts that were alleged to support the plaintiffs' fraud claims were used to support plaintiffs' claims under §§ 11 and 12(a)(2). In this case, plaintiffs did not include any fraud claims and instead only plead violations of the '33 Act, alleging only what is required under §§ 11 and 12(a)(2) of the '33 Act—that statements or omissions in the Adams Golf Registration Statement were materially false or misleading. Furthermore, nothing in the complaint suggests that it was "artfully pleaded" to avoid the heightened pleading requirements. Because plaintiffs claims do not "sound in fraud" the court finds that the heightened pleading standard of Rule 9(b) is not applicable to the plaintiffs' claims in this case.

### 2. Have plaintiffs stated their claims with sufficient particularity under The PSLRA?

The Underwriter defendants contend that plaintiffs have failed to satisfy the

heightened pleading standard of the PSLRA. These defendants point out that § 21(D)(b)(1) of the PSLRA requires that, in connection with any private action arising under the statute in which plaintiffs allege to have been misled by defendants' untrue statements or omissions of material fact, "the complaint shall specify each statement alleged to have been misleading [and] ... the reason or reasons why the statement is misleading...." 15 U.S.C. § 78u–4(b)(1).

■ Because §§ 11, 12(a)(2), and 15 do not require proof that the defendants acted with a particular state of mind, the defendants rely only on § 21(D)(b)(1) and not § 21(D)(b)(2) [2] of the PSLRA in arguing that plaintiffs fail to plead their allegations with the requisite particularity. The plaintiffs respond that the heightened pleading requirements for fraud under the PSLRA do not apply in this case because the PSLRA applies only to claims under the '34 Act and not to claims under to the '33 Act. As explained below, the plaintiffs are correct that § 21(D)(b)(1) of the PSLRA applies only to '34 Act fraud claims and does not apply to the claims raised in their complaint, which are wholly premised on the non-fraud provisions of the '33 Act.

The PSLRA, passed by Congress in 1995, contains provisions that amend the '33 Act (Section 101(a), codified at 15 U.S.C. § 77a et seq.) and the '34 Act (Section 101(b), codified at 15 U.S.C. § 78a et seq.). While many of the provisions are identical, the heightened pleading requirement, codified at 15 U.S.C. § 78u–4(b)(1), is expressly limited to the '34 Act and is not applicable to claims brought under

the '33 Act. The preamble of § 21(D)(b)(1) of the PSLRA begins, "In any private action arising under this title" and goes on to state that any material statements or omissions must be pleaded with particularity. 15 U.S.C. § 78u–4(b)(1). The reference to "this title" is to Title I of the Exchange Act of 1934 and not to the Securities Act of 1933.

Despite this clear statutory language, the Underwriter defendants rely on dicta from an unreported District of Massachusetts case. In that case, the court noted that provisions of the PSLRA applied to § 11 claims. *See Cooperman v. Individual, Inc.*, No. Civ. A. 96–12272, 1998 WL 953726, *7 (D.Mass. May 27, 1998). In the following paragraph, without explaining why the court determined that the PSLRA applied to the case at hand, the court stated that despite the fact that "[d]efendants in this case failed to move for dismissal under either Rule 9(b) or § 78u–4(b) ... I note that the Complaint does satisfy § 78u–4(b)...." *Id.* Given that the text of the PSLRA is clear that it does not apply to §§ 11 or 12(a)(2), the court declines to rely on the cited language from *Cooperman* here to find that the provisions of the PSLRA apply to claims under the '33 Act.

Moreover, even if the heightened pleading requirement did apply, the complaint is sufficiently detailed to meet those requirements. The complaint specifically highlights the allegedly false and misleading statements contained in the Registration Statement and Prospectus in connection with the gray market sales and inventory oversupply, explains why plaintiffs believe these statements were misleading, and al-

---

**2.** Section 21(D)(b)(2) of the PSLRA mandates that in actions arising under the statute "in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall ... state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

leges a factual basis for why plaintiffs contend that the defendants could have known that the statements were false and misleading at the time of the issuance of the Registration Statement and Prospectus.

### E. *Have Plaintiffs Stated a Claim Under Sections 11, 12(a)(2), and 15 of the '33 Act?*

The defendants have three remaining arguments in support of their motions to dismiss. First, the Adams Golf defendants claim that they do not qualify as "statutory sellers" as required by § 12(a)(2) of the '33 Act. In connection with this defense, they argue that the complaint did not allege that the Adams Golf defendants were either in privity with the plaintiffs or had immediately, directly, and actively solicited their purchases. *See Pinter v. Dahl*, 486 U.S. 622, 623, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 636 (3d Cir.1989). Second, the Adams Golf defendants claim that the plaintiffs failed to plead specific facts of "control" as required by § 15 of the '33 Act, arguing that plaintiffs' allegations of the defendant's status as director or senior officer of Adams Golf are insufficient to establish that the defendant is a "control person." *See Paracor Fin., Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir.1996) (stating that mere status as an officer or director does not establish "control"). Last, both sets of defendants argue that plaintiffs have failed to state a substantive claim under §§ 11, 12(a)(2), and 15 of the '33 Act because none of the statements in the Registration Statement and Prospectus were untrue or misleading when they were made. Because this last argument could be dispositive of all claims, the court will address it first.

As noted above, the plaintiffs' claims rest on two general theories. First, the plaintiffs allege that the defendants failed to disclose the existence of a gray market in Adams Golf Tight Lies Clubs, whereby unauthorized discount retailers like Costco acquired the Tight Lies Clubs and sold them at discounted prices. Plaintiffs claim that this gray market ultimately caused price margins for Adams Golf to erode. While the Registration Statement and Prospectus did not specifically refer to the gray market risk, it stated that "the Company does not sell its products through price sensitive general discount warehouses, department stores, or membership clubs." Second, the plaintiffs allege that the defendants failed to disclose the fact that there was an industry-wide oversupply of inventory at the retail level at the time of the IPO. Adams Golf confirmed in an April 12, 1999 press release that this oversupply condition weakened club sales industry wide. The Registration Statement and Prospectus did not disclose this condition; it stated that "[t]he Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers." Plaintiffs assert that the failure to disclose this "excess retail inventory" was a material misrepresentation of Adams Golf's present business condition and future business prospects that adversely affected the company's operating results.

### 1. *Do the plaintiffs' gray market allegations state a claim under the '33 Act?*

Plaintiffs allege that at the time of the IPO, the unauthorized, "gray market" distribution of Adams Golf's products to retail discounters posed "a material risk to the company's future results" that should have been disclosed in the Registration Statement. Plaintiffs also claim that the existence of gray market sales rendered the

following statements from the Registration Statement false or misleading:

- "the Company limits its distribution to retailers that market premium quality golf equipment and provide a high level of customer service and technical expertise;"
- "The Company currently sells its products to on-and-off course golf shops and selected sporting goods retailers;"
- "the Company does not sell its products through price sensitive general discount warehouses, department stores or membership clubs;"
- "The Company believes its selective retail distribution helps its retailers to maintain profitable margins;"

In order to state a claim under the '33 Act, the plaintiffs must allege that the registration statement contains a false or misleading statement or omits a material fact.

Defendants contend that the plaintiffs have alleged nothing more than that an unauthorized discount retailer obtained some Adams Golf clubs prior to the IPO and argue that the plaintiffs' gray market theory fails for two reasons. First, defendants claim, the challenged statements in the Registration Statement and Prospectus were true, were not misleading, and omitted nothing that was required to be stated when the Registration Statement became effective on July 9, 1998. Second, defendants assert that nothing alleged in the complaint raises an inference that Adams Golf should have or could have predicted that a gray market in its products posed any material threat to Adams Golf's business when the Registration Statement became effective. Defendants claim that the plaintiffs' claims are classic "fraud by hindsight" and that plaintiffs have simply worked back from statements made months after the IPO was completed to allege that the state of affairs as they were perceived at that time must have been the state of affairs on the effective date of the Registration Statement.

■ Adams Golf stated in its Registration Statement that it limits its distribution to retailers that market premium quality golf equipment and that the Company does not sell its products through price sensitive general discount warehouses. The court finds nothing in plaintiffs' allegations indicating that each of the these representations made in the Registration Statement were not true. Nowhere does the complaint allege that Adams Golf sold its products to Costco or authorized its retailers to do so; rather, the plaintiffs complaint alleges that authorized dealers and not Adams Golf, were "responsible for unauthorized distribution to discount retailers." Pl. Compl ¶ 28. It is noteworthy that the complaint itself defines "gray market distribution" as "the *unauthorized* distribution of the Company's products to discount retailers." *Id.* at ¶ 32 (emphasis added). The very existence of this alleged gray market is predicated on the selective distribution policy that Adams Golf discussed in its Registration Statement; the alleged gray market in Adams Golf products could not exist unless the Company's distribution were selective and discounters were unable to obtain Adams Golf products directly from Adams Golf. Therefore, the court finds that the facts alleged by the plaintiffs fail to demonstrate that any of the foregoing statements made in the Registration statement were false.

Having found that the plaintiffs have failed to allege that any of the statements made in the Registration Statement were false, the court next turns to the plaintiffs' claim that the Registration Statement contained misleading misrepresentations and material omissions that are actionable under the '33 Act. Plaintiffs attribute a great deal of significance to the fact that on June

9, 1998, one month before the Effective Date of the Registration Statement, Adams Golf issued a press release stating that "Adams Golf became concerned when it learned that Costco was selling their Tight Lies fairway woods because Costco is not an authorized distributor." According to the press release, Adams Golf filed a Bill of Discovery against Costco on that same day "to determine whether Costco's claims that they had properly acquired Adam's Tight Lies fairway woods for resale were accurate." The plaintiffs assert in their complaint that the Registration Statement and Prospectus was materially false and misleading because it stated that " 'the Company does not sell its products through price sensitive general discount warehouses, department stores, or membership clubs,' [when] in fact, at the time of the IPO, Costco was obtaining and selling to the golfing public significant numbers of Tight Lies clubs." Pl. Consol. and Am. Class Action Comp. ¶ 36.

As stated above, the court finds that the above statement is not false; just because Costco was *obtaining* the clubs does not mean Adams Golf was selling the clubs to them. Moreover, the filing of the Bill of Discovery and the issuing of the press release are consistent with the defendants contentions that it was in fact Adams Golf's policy not to authorize "distribution of the Company's products to discount retailers." Adams Golf filed a Bill of Discovery against Costco precisely because it maintained a selective distribution strategy. In addition, although the '33 Act does not require proof of fraudulent intent, Adams Golf's disclosure of their investigation into this incident in its press release undermines the allegations that the defendants sought to conceal or did conceal the existence of an gray market for its products.

Adams Golf issued the allegedly false or misleading Registration Statement and Prospectus on July 9, 1998, and stated within that selective distribution was one of Adams Golf's key marketing policies. Six months later, on January 7, 1999, in a statement accompanying its projections of disappointing fourth quarter 1998 results, Adams Golf disclosed that "results had been, were currently, and would continue to be materially, adversely affected by gray market distribution to discount retailers ... [such as] membership warehouse club[s]." *Id.* at ¶ 40. Later that year, in the Company's 1998 Form 10–K Report, filed with the SEC in March, Adams Golf stated that:

> Despite the Company's efforts to limit its distribution to selected retailers, Adams Golf products have been found in a certain membership warehouse club, which the Company believes has obtained the products through the use of unauthorized distribution channels. Adams Golf has taken steps to limit this unauthorized distribution through the serialization of all Adams Golf club heads but does not believe the gray marketing of its products can be totally eliminated.

Plaintiffs assert that the foregoing chronology demonstrates that the Adams Golf Prospectus failed to disclose and thus misrepresented the following two facts: "(1) that gray marketing represented a material risk to the Company in that it posed a threat to the Company's earnings; (2) that gray marketing represented a material problem that could not be 'totally eliminated' by the Company's corporate controls." *Id.* at ¶ 42.

While the plaintiffs build their case around Adams Golf statements appearing after the IPO date, in order to state a claim for a material omission, the plaintiffs allegations must identify that this alleged

undisclosed material risk was known and material at the time of the IPO. *Zucker v. Quasha,* 891 F.Supp. 1010, 1014 (D.N.J. 1995) (quoting *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1040 (6th Cir. 1991)) ("A court evaluates whether the statement or omission was misleading at the time it was made... 'Fraud by hindsight' ... is not actionable."); *see also Castlerock Management Ltd. v. Ultralife Batteries, Inc.,* 68 F.Supp.2d 480, 488 (D.N.J.1999) ("omissions that create a misleading impression—particularly one that is misleading in hindsight—are not sufficient to constitute the basis of a securities action under Section 11 or Section 12(2)").

■ The plaintiffs' complaint does not plead facts that, if proved, would demonstrate that at the time of the filing of the IPO, the Adams Golf defendants or the Underwriter defendants had any reason to assume that the presence of a limited number of golf clubs at one discount retailer was anything more than an isolated incident or that the incident would have any material significance. Drawing all favorable inferences from the well-pleaded facts, the complaint pleads only that at the time of the IPO, Costco had about 5,000 Tight Lies clubs and that Adams Golf was investigating Costco's apparent acquisition of Tight Lies product. The complaint does not allege facts that demonstrate that, at the time of the IPO, Adams Golf should have or did consider the presence of its clubs at Costco to be anything more than an isolated event. In sum, plaintiffs have not alleged support for their proposition that the fact that an unauthorized discount retailer had illegally obtained a number of Adams Golf clubs constituted a material risk at the time of the IPO, or a "known trend" threatening the Company's future sales, that should have been disclosed. The securities laws require that companies disclose known material facts; they do not

require companies to disclose speculative facts that might have some material albeit unknown impact on future earnings. *Craftmatic,* 890 F.2d at 644. Accordingly, the court finds that the plaintiffs' allegations regarding the alleged "gray market" claim are insufficient to survive the defendants' Rule 12(b)(6) motions and will dismiss the complaint with respect to the those allegations.

2. *Do the plaintiffs' industry over-supply allegations state a claim under the '33 Act?*

Plaintiffs' second theory for relief under the securities laws is that the Registration Statement and Prospectus contained false or misleading statements or omissions regarding the existence of a retail level over-supply condition in the golf club industry prior to the IPO offering. This theory focuses on two alleged wrongs by the defendants. First, Adams Golf failed to disclose material information regarding the levels of retail inventory in the golf equipment industry, generally. Second, this failure to disclose this general industry problem rendered false or misleading Adams Golf's firm-specific statements about its ability to deliver its products promptly to its retailers and about its prospects for future growth.

In support of their oversupply theory, plaintiffs allege that on January 7, 1999, approximately six months after the IPO, Adams Golf disclosed that it would "offer extraordinary credits to its own retailers, at the cost of millions of dollars, in an attempt to alleviate problems arising from those retailers' excess inventory." Pl. Consol. and Am. Class Action Comp. ¶ 49. "Then, on April 12, 1999, in reporting disappointing results for the first quarter of 1999, ending March 31, 1999, defendants disclosed that for at least 12 months ... there had been an 'oversupply of inventory

at the retail level' on an industry-wide basis." *Id.* at ¶¶ 43, 49.

Inferring that since the April 12, 1999 disclosure stated that the oversupply had existed for at least 12 months, and that therefore the defendants must have known about the condition prior to the July 9, 1998, Effective Date of the Registration Statement and Prospectus, the plaintiffs allege that the following statements from the Registration Statement are actionable under the '33 Act as being false or misleading:

- "The Company believes its prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory than may be required with other golf equipment manufacturers;"

- "In 1997, wholesale sales of golf equipment in the U.S. reached an estimated $2.4 billion. Wholesale sales of golf clubs increased at an estimated compound annual growth rate of approximately 13% over the 5–year period from 1992–1997. The Company believes that a number of trends are likely to further increase the demand for Adams' products. These trends include: (i) significant growth in the number of golf courses; (ii) increasing interest in golf from women, junior, and minority golfers; (iii) the large numbers of golfers entering their 40s and 50s, the age when most golfers begin to play more often and increase their spending on the sport; (iv) the correspondingly large population of 'Echo Boomers,' who are beginning to enter their 20s, the age of when golfers generally take up the sport; and (v) the rapid evolution of golf club designs and materials;"

Plaintiffs assert that not only did the Registration Statement and Prospectus fail to indicate that Adams Golf retailers were carrying excess inventory, the first of the above statements from the Registration Statement materially misled the market that the opposite was the case. *Id.* at ¶ 49. Plaintiffs further contend that the defendants should have disclosed the industry-wide retail oversupply problem in the Registration Statement and that their failure to do so, especially in light of all the other risks relating to competition and industry factors that were disclosed, was an omission of material fact in violation of the '33 Act. *See id.* at ¶¶ 45–48.

In support of the plaintiffs' claim that this fact was both material and that it was known or knowable by Adams Golf prior to the IPO, the complaint (i) notes that "various sources have informed plaintiffs that, prior to the IPO, competitors of Adams Golf had begun to take corrective action to address the industry-wide oversupply of equipment," *id.* at ¶ 50, and (ii) references an April 13, 2000 article from the Wall Street Journal, which analyzes golf industry trends for the past decades and concludes that "industry revenue growth in the 1990s was achieved by 'milking money out of its cash cows—avid golfers who play at least 25 times a year—with ever-more-costly equipment and playing fees.'" *Id.* at ¶¶ 51–54.

In their briefs the defendants counter that they had no duty to disclose industry-level trends, but only had a duty to disclose material risks regarding Adams Golf itself. Therefore, with respect to the alleged omissions, defendants contend that their failure to disclose industry trends is not actionable. *See Whirlpool Fin. Corp. v. GN Holdings,* 67 F.3d 605 (7th Cir.1995) (finding that nondisclosure of industry-wide trends is not a basis for a securities claim); *Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 515 (7th Cir.1989) (noting that "[s]ecurities laws require issuers to disclose firm-specific information; in-

vestors and analysts combine that information with knowledge about the competition, regulatory conditions, and the economy as a whole to produce a value for stock."). The defendants also respond that even if there were a duty to disclose industry trends, there are no facts alleged that demonstrate that the information that plaintiffs contend should have been disclosed was known or even knowable on July 9, 1998. Instead, the plaintiffs assume that the pattern of macro-economic factors perceived in April 1999 were just as visible and obvious on July 9, 1998 and should have at that time been seen to have certain material effects on the company's future performance. *See Craftmatic*, 890 F.2d at 644 (holding that where there was no allegation that management had any reliable forecasts regarding matters plaintiffs urged should have been disclosed, failure to disclose not actionable because it would have been so "speculative and unreliable" as to be immaterial).

The defendants go on to specifically address the alleged misrepresentations. First, defendants note that the allegedly false or misleading statement that "[Adams Golf's] prompt delivery of products enables its retail accounts to maintain smaller quantities of inventory" than retailers of Adams Golf competitors is both relative and qualified. Such a statement, defendants argue, cannot be false or misleading as to Adams Golf's retailers' inventory levels, because it does not make any representation about this fact. It merely states that Adams Golf's business practice of prompt delivery enables its retailers to maintain a relatively smaller inventory.

The complaint alleges no facts indicating that Adams Golf did not deliver its products to its retailers in a prompt fashion or that this policy did not enable Adams Golf retailers to carry relatively less inventory as compared to its competitors' retailers.

Therefore, the court presumes that plaintiffs do not challenge the truth of the statement, but rather allege that it is misleading. Moreover, the court agrees with the defendants that the plaintiffs have alleged no facts that could demonstrate that this statement of an Adams Golf business strength that gives it an advantage over its competitors is misleading.

With respect to plaintiffs' contention that the second statement, a forward-looking expression of belief that certain factors and positive trends in the golf industry bode well for the company's future growth prospect, is "misleading with respect to the prospects for growth in the golf industry," Pl. Am. and Consol. Comp. at ¶¶ 44, 51, the defendants raise three arguments. First, in order to be actionable, the challenged statements must mislead a reasonable investor as to the prospects of Adams Golf—not the golf industry, generally. *Whirlpool*, 67 F.3d at 609. Second, the statement Adams Golf made about itself is merely an expression of vaguely optimistic belief that these factors would positively influence demand for its products, and is therefore too vague to be actionable. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir.1997) (stating that generally optimistic statements regarding growth prospects constitute nothing more than puffery and are not actionable under federal securities laws). Third, this statement cannot be actionable because, under the "bespeaks caution" doctrine, which holds that if "an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements," those forecasts cannot be the basis of a securities claim unless it is reasonable to assume that the statements affected the total mix of information the document provided investors. *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir.1993). It is undisputed that Adams Golf's statements concerning

the golf equipment industry were accompanied by the disclosure of certain cautionary statements concerning the investment risks associated with investing in a golf equipment maker based on such factors as decline in demand, pressure on sales margins from reduced consumer spending, and market competition. The defendants argue that in light of its contemporaneous disclosure of these risks, Adams Golf's forward-looking statements of belief as to general industry trends cannot be considered misleading.

Plaintiffs do not allege that Adam's Golf retailers had an existing oversupply of golf clubs at the time of the IPO. They only allege that there was a problem in "the industry." The court's analysis begins with the proposition that Adams Golf does not have the absolute duty to disclose industry-wide trends. Rather, it is Adams Golf's duty under the securities laws to disclose in its Registration Statement and Prospectus all material facts with respect to Adams Golf that were known or knowable at the time of the IPO. Failure to do so is an omission that is actionable under the '33 Act.

The plaintiffs argue that three "facts" alleged in the complaint support their allegation that Adams Golf had knowledge at the time of the IPO that an industry-wide trend of oversupply was a material risk to its performance. Those facts are that: (i) plaintiffs' "sources" indicate that other competitors were addressing the oversupply issue prior to July 9, 1998; (ii) an April 2000 Wall Street Journal article analyzing trends in golf concludes that the growth potential of the market in the 1990s was vastly exaggerated by companies within the industry; and (iii) Adams Golf's April 1999 disclosure states that "for at least 12 months ... there had been an 'oversupply of inventory at the retail level' on an industry-wide basis." *Id.* at ¶¶ 43, 49.

The court finds that even when the truth of those facts are assumed, as they must be for the purposes of this motion, they do not demonstrate that Adams Golf had any knowledge *at the time of its IPO* that there was an existing industry-wide trend of oversupply that was or would be materially affecting Adams Golf. The fact that competitors assessed a problem at that time with their retailers, says nothing about the existence of any problems discoverable at that time by Adams Golf. Nor can the plaintiffs rely on the Wall Street Journal article from nearly two years after the Effective Date or Adams Golf's April 1999 statement. With respect to those two supporting facts, the court agrees with defendants that, even under the deferential standard of Rule 12(b)(6), one cannot reasonably infer from ex-post analyses of macro-economic trends that factors which were determined as material based on a backward-looking analysis were equally apparent and material at some earlier point in time. *Accord Scibelli v. Roth,* 98 Civ. 7228, 2000 WL 122193, *3, 2000 U.S. Dist. LEXIS at *10 (S.D.N.Y. January 31, 2000) (dismissing Section 11 action and noting that plaintiffs' complaint failed to allege a securities violation because "[t]o infer that Nortel possessed such information on July 24 because Nortel announced such information on September 29 is not a reasonable inference"); *see also Zucker,* 891 F.Supp. at 1016 ("Even Section 11, which provides strict liability against the issuer of stock for misstatements in the prospectus, does not impose liability for the omission of material information which was unknown to, and not reasonably discoverable by, the defendants.") (internal quotations omitted); *In re Number Nine Visual Tech. Corp. Sec. Litig.,* 51 F.Supp.2d 1, 17 (D.Mass.1999) (plaintiffs "insufficiently alleged material misstatements based solely on the subsequent an-

nouncement of inventory markdowns by [defendant]" eight months after the initial public offering). Defendants cannot be subject to liability under the securities laws for their failure to predict in the IPO documents facts that occurred or patterns that were discerned after the IPO. *See Castlerock,* 68 F.Supp.2d at 488 ("omissions that create a misleading impression—particularly one that is misleading only in hindsight—are not sufficient to constitute the basis of a securities action under section 11 or section 12(2)") (citing *Zucker,* 891 F.Supp. at 1017).

■■■■ Having found that the defendants did not omit a material fact in the Registration Statement, the court next turns to whether any of the statements that were included were false or misleading. The court agrees with the defendants that the forward-looking statements cited in the plaintiffs' complaint that identify trends, which "the Company believes ... are likely to further increase the demand for Adams' products," are not actionable as false or misleading under the "bespeaks caution" doctrine. While the plaintiffs argue that the risk factors failed to include the specific risk of retailer inventory oversupply, the court has already found that the plaintiffs failed to allege sufficient facts indicating that this risk was known or knowable at the time of the offering. Therefore, the court finds here that Adams Golf's optimistic statements were adequately tempered by the host of risk factors that accompanied it, such that they cannot be considered false or misleading.

Accordingly, the court finds that the plaintiffs' allegations regarding the alleged "inventory oversupply" claim are insufficient to survive the defendants' Rule 12(b)(6) motions and will dismiss the complaint with respect to the those allegations. Having now found that the plaintiffs have not stated a claim under either §§ 11 or

12(a)(2), the court is compelled to find that the plaintiffs have not stated a claim under § 15, because a § 15 violation requires, as a prerequisite, a violation of § 11 or § 12(a)(2).

## IV. CONCLUSION

The court first determined that plaintiffs' complaint is pleaded with sufficient particularity, that certain of the plaintiffs do not have standing under § 12(a)(2), and that all of the plaintiffs have standing under § 11 to the extent they can prove that their shares are traceable to the IPO.

However, after reviewing the substance of the plaintiffs allegations, the court finds that the plaintiffs' allegations are insufficient to withstand the defendants' motions to dismiss. Even drawing all reasonable inferences in favor of the plaintiffs in assessing the defendants' motions to dismiss, the court is unable to find that the factual allegations in support of either of plaintiffs' two theories state a claim for violation of § 11, § 12(a)(2), or § 15 of the '33 Act. Therefore the court will grant the defendants' motions to dismiss. Accordingly the court need not assess the other aspects of the Adams Golf defendants' motion challenging the adequacy of the allegations as to whether they qualify as "statutory sellers" for purposes of § 12(a)(2) and whether they qualify as "control persons" for purposes of § 15.

The court will enter an order in accordance with this opinion.